IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SILICON GRAPHICS, INC.,

                                    OPINION and ORDER

            Plaintiff,

                                    06-cv-611-bbc

        v.

ATI TECHNOLOGIES, INC.,
ATI TECHNOLOGIES, ULC and
ADVANCED MICRO DEVICES, INC.,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Silicon Graphics, Inc. has filed a motion to disqualify law firm Robins, Kaplan, Miller & Ciresi LLP from representing defendants ATI Technologies, Inc., ATI Technologies, ULC and Advanced Microdevices, Inc. in this case. Dkt. #633. The question is whether disqualification is required because a lawyer who performed work for plaintiff on this case in 2006 and 2007 now works for Robins Kaplan. The motion is ready for decision.

This case has a long and contentious history, which I will summarize briefly for context. Plaintiff filed the lawsuit in October 2006, alleging that defendants infringed three patents related to graphics processing technology. Defendants asserted counterclaims under various theories of invalidity and unenforceability. Plaintiff abandoned its claims as to one

1

patent; I granted defendants' motion for summary judgment as to a second patent, dkt. #505; and plaintiff conceded that it could not prove infringement as to the third patent, U.S. Pat. No. 6,650,327, in light of this court's construction of several claim terms. Nevertheless, defendants persuaded me that the issue of invalidity was not moot and a trial was held on the question whether several claims in the '327 patent were anticipated by prior art.  A jury found in favor of plaintiff and I denied defendants' post verdict motions challenging the jury's finding.  In addition, I rejected defendants' argument that the '327 patent was unenforceable under the doctrine of inequitable conduct.  Between the time plaintiff filed the complaint and judgment was entered, the parties filed more than 100 motions.

On appeal, plaintiff challenged this court's construction of several terms in the '327 patent; defendants challenged the dismissal of their invalidity counterclaims.  In a decision dated June 4, 2010, the Court of Appeals for the Federal Circuit upheld the jury's verdict regarding invalidity, but it concluded that I had misconstrued two terms in the '327 patent. Dkt. #623.  The court remanded the case for a determination whether computer chips and processors made and sold by defendants infringe the '327 patent under the new constructions. Silicon Graphics, Inc. v. ATI Technologies, Inc., 607 F.3d 784 (Fed. Cir. 2010).

Plaintiff filed its motion for disqualification soon after the court of appeals issued its

decision.  The lawyer at the center of plaintiff's motion for disqualification is David Leichtman. Between December 2006 and October 2007, Leichtman performed legal work in this case for plaintiff in his capacity as a partner at Morgan, Lewis and Brockius, one of the law firms representing plaintiff.  Leichtman left Morgan Lewis in October 2007 to become a partner at Lovells (now Hogan Lovells).  In February 2010, while this case was on appeal and after oral argument, Leichtman took a job as a partner at Robins Kaplan's New York office.

The parties agree that Leichtman may not perform any work for defendants in this case.  The question is whether Robins Kaplan must be disqualified as well.  Defendants say that disqualification is not required or appropriate because Leichtman performed a relatively small amount of work for plaintiff and because Robins Kaplan has employed a screening protocol in this case to prevent Leichtman, who works in New York, from disclosing any information he might have to the lawyers in this case, who work in Minneapolis.  For its part, plaintiff has few qualms about Robins Kaplan's screening mechanism.  Instead, plaintiff says that Leichtman performed so much work on the case that screening cannot be used to rebut the presumption that Leichtman has shared confidential information with defendants' lawyers working on this case or will do so in the future.

In addition to plaintiff's motion for disqualification, two preliminary motions are before the court, both filed by defendants: (1) a motion to conduct an oral argument on

3

plaintiff's motion; and (2) a motion to file a surreply brief.  Defendants do not explain why they wish to have oral argument and I do not believe one is necessary to resolve plaintiff's motion.  I will grant the motion to file a surreply.  Although most of the brief adds little to the discussion, it includes additional screening procedures that defendants agree to employ in response to new concerns raised by plaintiff in its reply brief.

With respect to plaintiff's motion for disqualification,  I conclude that screening is an appropriate method to address concerns about confidentiality when a lawyer changes law firms in the middle of a case, even if the lawyer performed a substantial amount of work for the former client.  This conclusion is required by Cromley v. Board of Education of Lockport Township High School District 205, 17 F.3d 1059 (7th Cir. 1994), and other cases decided by the Court of Appeals for the Seventh Circuit in which the court has held that law firms may avoid imputation through appropriate screening mechanisms regardless of the scope of the work performed for the former client by the disqualified lawyer.  Because plaintiff does not raise any serious challenges to the screening conducted in this case, plaintiff's motion to disqualify Robins Kaplan will be denied. This conclusion makes it unnecessary to consider defendants' alternative argument, which is that plaintiff's motion is barred under doctrines of waiver and laches.

Set forth below are the undisputed facts, which are drawn from defendants' proposed findings of fact and the record.  I have accepted all of defendants' proposed findings of fact

4

as true because plaintiff did not dispute any of them.  Further, I have disregarded plaintiff's proposed findings of fact because plaintiff filed them with its reply brief rather than its brief in chief.  Because neither side was required to file proposed findings of fact, I considered facts in both sides' briefs so long as they were supported by a citation to the record.

## UNDISPUTED FACTS

### A.  David Leichtman's Work for Plaintiff

Plaintiff Silicon Graphics filed this lawsuit on October 23, 2006.  At the time, David Leichtman was a partner for Morgan, Lewis and Brockius, one of the law firms representing plaintiff. Robins, Kaplan, Miller & Ciresi LLP represented defendants at the time and still represents them.

Leichtman began working on the case on December 7, 2006; he did not participate in any pre-suit investigation of plaintiff's claims.  On December 12, 2006, defendants filed a motion in which they asked for pro hac vice status for Leichtman, along with five other lawyers.  The court granted the motion the following day.

The scope of the lawsuit was extensive, including 306 document requests, 37 interrogatories, 33 depositions, 10,000,000 pages of documents, 24 third-party subpoenas and approximately 100 motions. Leichtman was involved in three areas of the lawsuit: (1) third party discovery; (2) inequitable conduct; and (3) damages.  Between December 7, 2006

and October 2, 2007, Leichtman billed plaintiff for 186 hours, for a total of $111,273.88.

This represents approximately 8% of his billable time during that time period.  Leichtman

left Morgan Lewis in October 2007 to become a partner at Lovells.


B.  Leichtman's Job with Robins Kaplan

In the fall of 2009 Leichtman interviewed with Robins, Kaplan, Miller & Ciresi LLP

for a position in a new office to be opened in New York City.  To identify potential conflicts

of interest, Leichtman filled out a questionnaire identifying all of the clients for which he had

performed services in the last five years.   He listed plaintiff as one such client.

At the request of the ethics partner for Robins Kaplan, Leichtman wrote a letter

asking plaintiff to waive any potential conflicts:

> The Rules of Professional Conduct require that I maintain client confidences
> or confidential information which I may have learned about Silicon Graphics,
> Inc. and I will of course maintain such confidences.  But because of my former
> representation of Silicon Graphics, Inc., Robins, Kaplan, Miller & Ciresi LLP
> believes it appropriate to request waivers of the conflict of interest that would
> otherwise arise from me becoming a partner there. Robins is also in the process
> of obtaining AMD and ATI's consent, and have asked me to obtain Silicon
> Graphics, Inc.'s consent.

Leichtman described Robins Kaplan's screening procedures in the letter:

> As part of the consent, Robins, Kaplan, Miller & Ciresi LLP will create an
> ethical wall. This ethical wall will prohibit any access to the files or
> communication between me and anyone working on the matter or any future
> litigation involving Silicon Graphics, Inc. as an adverse party.  This includes

not only the physical hardcopy files but the electronic document management system.

When Leichtman did not receive a response from plaintiff, the ethics partner conducted additional research regarding the ethical rules and talked to Leichtman about "the timing and general scope" of Leichtman's work for plaintiff.  They agreed that Leichtman's work was minor and isolated.  The ethics partner concluded that Leichtman would not receive any compensation for this lawsuit and that it would not be necessary to obtain consent from plaintiff.

In a letter dated December 28, 2009 Leichtman gave plaintiff notice that he was joining Robins Kaplan. He wrote:

> I wanted to advise you that Robins Kaplan has determined that the applicable rules of professional responsibility do not require that we obtain consent from either party in order for me to join the firm. . . .

> [M]y minor previous work for Silicon Graphics in the Matter was isolated.  I did not learn confidential information and did not have contact with Silicon Graphics.  I am no longer associated with the firm where that minor work was done, and have not been for over two years.

> In addition, I have been screened from any participation in the matter and will be apportioned no part of the fee from the matter.

> Counsel for plaintiff responded in a letter dated January 29, 2010:

> I have received your correspondence (i) requesting a waiver from SGI and later (ii) withdrawing this request.  As we discussed, I passed on your initial request to Barry Weinert. [Plaintiff] was not inclined to grant any waiver, and so I guess in a sense, your withdrawal of the request is fine.

7

Once a decision is made in the <u>SGI v. ATI</u> appeal, I'm sure [plaintiff] will consider the issue of your waiver request and "notice." We note that your second letter seems to suggest that no waiver is required because you "performed no more than minor and isolated services" for SGI at Morgan Lewis. [Plaintiff] does not believe that this provision applies and therefore reserves all of its rights with respect to this matter.

On January 11, 2010 Robins Kaplan sent an "ethical wall memorandum" to Leichtman and all the members of the litigation team for this case. The memorandum instructed team members not to discuss the case with Leichtman or in his presence. Under the memorandum, Leichtman is denied access to any records relating to this case and may not provide team members any information he knows about the case.

Leichtman joined Robins Kaplan on February 1. The firm employs 242 lawyers nation-wide; 100 of these practice "in the intellectual property field." All of the Robins Kaplan lawyers working on this case and defendants' physical records related to the case are in the Minneapolis office. All of the electronic records are protected by a computer security protocol that prevents Leichtman from viewing or searching those records. Leichtman has never spoken to anyone at Robins Kaplan about this case and no staff members have had a discussion about the case in his presence. He has not viewed any of the records relevant to this case or attempted to do so.

Robins Kaplan has represented defendants from the beginning of the lawsuit.

OPINION

In recent years, "attorney mobility and firm mergers have increased exponentially." Kirk v. First American Title Insurance Co., 183 Cal. App. 4th 776, 802 (Ct. App. 2010). One consequence of this phenomenon is that a lawyer is now more likely to find herself working for a law firm that represents a client with interests adverse to the client of a former employer.  Particularly in large-scale, protracted litigation, the lawyer may end up working for law firms on both sides of the same case at different stages of the proceedings.

When a lawyer "switches sides," it implicates a number of competing interests.  First, the former client may be understandably concerned about confidential information that could be shared with the opposing party.  In addition, "[t]he bar and this court have an interest in maintaining the integrity and favorable public image of both the  legal profession and the judicial system by preventing even the 'appearance of professional impropriety.'" Tucker v. George, 569 F. Supp. 2d 834, 837-38 (W.D. Wis. 2008) (quoting Code of Professional Responsibility, Canon 9).  On the other side, the client of the law firm that hired the lawyer has an interest in keeping the law firm that it has chosen and that is familiar with the case.  Particularly in a case like this one that has lasted for several years, a requirement to choose a new law firm is potentially devastating to defendants and could lead to substantial delays in the final resolution of this case.  It is no answer to say that it is the client's own fault because the client may have played no part in the circumstances that led

9

to the potential conflict.  In the middle is the individual lawyer who has an interest in finding fulfilling employment.  In re County of Los Angeles, 223 F.3d 990, 996 (9th Cir. 2000) ("An automatic disqualification rule would make firms be understandably more reluctant to hire mid-career lawyers, who would find themselves cast adrift as 'Typhoid Marys.'")

Courts considering motions to disqualify counsel must strive to find the appropriate balance in weighing these concerns.  Tucker, 569 F. Supp. 2d at 837-38.  At the center of these considerations is a desire to prevent *either* side from using the switch to obtain a tactical advantage in the lawsuit.  Former clients should not be exposed to unfair risks that a lawyer will use confidential information to aid her new employer at the expense of the former client. At the same time, former clients should not be permitted to use ethical rules as a weapon to cripple their opponent when there is no legitimate concern about potential harm. Manning v. Waring, Cox, James, Sklar and Allen,  849 F.2d 222, 224 (6th Cir. 1988) ("[T]he ability to deny one's opponent the services of capable counsel, is a potent weapon."); Board of Education of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) ("[D]isqualification motions are often interposed for tactical reasons.").

The American Bar Association and local bars have generated rules to guide courts and lawyers in determining when disqualification is appropriate, but the conclusions of these various regulators are not uniform.  All agree, including both sides in this case, that a lawyer

10

who performs work for one party in a lawsuit may not *personally* perform work for the other side if he is later hired by the law firm representing that side.  The more difficult question is when an individual lawyer's disqualification must be imputed to the entire law firm.

Under the previous version of Model Rule 1.10 of the Model Rules of Professional Conduct, law firms could not use screening as a method for avoiding imputation.  American Bar Association, Annoted Model Rules of Professional Conduct 177 (6th ed. 2007) ("Under Model Rule 1.10, imputation generally cannot be avoided by screening the individually disqualified lawyer; only if the disqualification is based upon a lawyer's activities before becoming a lawyer will screening be an option.").  This changed in 2009, when the ABA adopted a new version of Model Rule 1.10:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless
>
>> (1) the prohibition is based on a personal interest of the disqualified lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm; or
>>
>> (2) the prohibition is based upon Rule 1.9(a) or (b) and arises out of the disqualified lawyer's association with a prior firm, and
>>
>>> (i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;
>>>
>>> (ii) written notice is promptly given to any

11

affected former client to enable the former client
to ascertain compliance with the provisions of this
Rule, which shall include a description of the
screening procedures employed; a statement of
the firm's and of the screened lawyer's compliance
with these Rules; a statement that review may be
available before a tribunal; and an agreement by
the firm to respond promptly to any written
inquiries or objections by the former client about
the screening procedures; and

(iii) certifications of compliance with these Rules
and with the screening procedures are provided to
the former client by the screened lawyer and by a
partner of the firm, at reasonable intervals upon
the former client's written request and upon
termination of the screening procedures.

Under the new rule, screening is generally permitted so long as the notice requirements are

met.

The ABA considered and rejected a rule that disqualified a law firm, regardless of

screening, in any case involving a lawyer's "substantial involvement" with a former client or

in which the lawyer had "substantial material information" about a former client.  One of

the reasons for the rejection was that the proposed standards were too vague.  ABA Standing

Committee on Ethics & Professional Responsibility, Report to the House of Delegates, at 14

(Feb. 2009), available at www.abanet.org ("Clarity is required when a lawyer and a firm

decide whether to consider associating with each other, at which time no tribunal is available

to decide the 'substantial involvement' question.")  However, the ABA stated that the new

rule was flexible enough to require disqualification in exceptional circumstances.   For example, "if a substantial number of lawyers on one side of a litigation move to the law firm representing the other side, a tribunal might disqualify the other side's law firm, because it would be reasonable to doubt the efficacy of screens established for so many lawyers who possess so much material confidential information."  Id. at 12.

In concluding that screening was appropriate as a general matter, the ABA rejected the view that "client protection and lawyer mobility" are mutually exclusive goals.  Id. at 10. It noted that a

> confidentiality duty continues after termination of the client-lawyer relationship. If a lawyer breaches that duty, she is subject to discipline, whether she has changed firms or not. Screening is a mechanism to give effect to the duty of confidentiality, not a tool to undermine it. . . . . Screening does not solve all . . . problems, but reduces them to situations where the interests of the former clients cannot adequately be addressed by the screening mechanism.

Id. at 11-12.

At least 12 states have a rule of imputed disqualification similar to th ABA model rule that allows for screening regardless of the scope of the work conducted by the lawyer for the former client.  Kirk, 183 Cal. App. 4th at 802-803.  About the same number of states allow for screening under more limited circumstances.  Id.   In adopting the new rule, the ABA relied on the experience of these states, concluding that history has "established [that] screens are effective to protect confidentiality" and "that courts have exhibited no difficulty

13

in reviewing and, where screening was found to have been effective, approving screening mechanisms." Committee Report at 11.  <u>See also</u> Robert A. Creamer, "Three Myths about Lateral Screening," <u>Professional Lawyer</u> 20 (Winter 2002) ("[T]he experience of about 70,000 Illinois lawyers over nearly nine years has been no formal cases involving charges that an effort to screen under Rule 1.10 was inadequate to protect confidential information.") (internal quotations omitted).

This leaves about half of the states that require automatic disqualification.  However, some predict that, "[w]ith the passage of amended Model Rule 1.10, more states will likely follow suit" to allow screening under more circumstances.  Kathy L. Yeatter, "Ethical Considerations of the Mobile Lawyer," <u>American Bankruptcy Institute Journal</u> 22 (May 2009). <u>See, e.g.</u>, Mark Fucile, "Screening: An Idea Whose Time Has Come?" <u>Advocate</u> 21 (Jan. 2010) (arguing that Idaho should adopt model rule).

A. <u>Choice of Law</u>

In this case, the parties point to different sources of law that they say should guide the court's decision on the question whether Robins Kaplan should be disqualified from representing defendants in this case.  Plaintiff says that the court should apply Wisconsin Supreme Court Rules 20:1.9(a) and 20:1.10(a), which allow screening, but only in limited circumstances.  SCR 20:1.9(a) provides:

14

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in a writing signed by the client.

SCR 20:1.10(a) provides:

While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by SCR 20:1.7 or SCR 20:1.9 unless:

(1) the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm; or

(2) the prohibition arises under SCR 20:1.9, and

(i) the personally disqualified lawyer performed no more than minor and isolated services in the disqualifying representation and did so only at a firm with which the lawyer is no longer associated;

(ii) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(iii) written notice is promptly given to any affected former client to enable the affected client to ascertain compliance with the provisions of this rule.

Plaintiff says that, under SCR 1.10(a)(2), screening is not sufficient in this case because Leichtman's work was not "minor" and "isolated" within the meaning of the rule.

Defendants point to a standard that the Court of Appeals for the Seventh Circuit has applied in the past:

First, we must determine whether a substantial relationship exists between the

15

subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted.  If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make disqualification proper.

Schiessle v. Stephens, 717 F.2d 417, 420 (7th Cir. 1983) (footnote omitted).  See also

Cromley v. Board of Education of Lockport Township High School District 205, 17 F.3d

1059, 1064 (7th Cir.1994) (applying same standard).  Defendants do not deny that the first

two parts of this standard are met, but they argue that "the presumption of shared

confidences has been rebutted with respect to the present representation."

An initial question is whether there is a meaningful difference between the two

standards.  Plaintiff says there is not, that Wisconsin's requirement that previous work be

"minor" and "isolated" may be incorporated into the Seventh Circuit's requirement that the

law firm must rebut the presumption of shared confidences.  In other words, plaintiff's

position is that defendants cannot rebut the presumption unless Leichtman's work for

plaintiff was minor and isolated.

Plaintiff's view has no support in this circuit's case law.  The court of appeals has

stated explicitly that a law firm can rebut the presumption through "proof that screening

procedures were timely employed in the new law firm to prevent the disclosure of

information and secrets."  Cromley, 17 F.3d at 1065.  See also Schiessle, 717 F.2d at 421

16

(citing <u>LaSalle National Bank v. Lake County</u>, 703 F.2d 252, 259 (7th Cir. 1983))("[T]he presumption of shared confidences could be rebutted by demonstrating that 'specific institutional mechanisms' (e.g., 'Chinese Walls') had been implemented to effectively insulate against any flow of confidential information from the 'infected' attorney to any other member of his present firm."). This is consistent with the view of other circuits. <u>E.g.</u>, <u>Hempstead Video, Inc. v. Incorporated Village of Valley Stream</u>, 409 F.3d 127, 138 (2d Cir. 2005) ("We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from de facto separation that effectively protects against any sharing of confidential information—cannot adequately protect against taint."); <u>Manning</u>, 849 F.2d at 225 ("One method of rebutting the presumption is by demonstrating that specific institutional screening mechanisms have been implemented to effectively insulate against any flow of confidential information from the quarantined attorney to other members of his present firm.")

Plaintiff does not cite any cases in which the Court of Appeals for the Seventh Circuit concluded that the amount of work the lawyer performed for the former client made screening procedures ineffective. <u>E.g.</u>, <u>Cromley</u>, 17 F.3d at 1065 (concluding that defendant's law firm rebutted presumption of shared confidences through screening procedures even though lawyer in question had personally represented plaintiff in same case for two years). Rather, in <u>Cromley</u>, the court stated that "the presumption of shared

17

confidences has been found to be irrebuttable only when an entire law firm changes sides." Id. at 1066. In other words, the assumption underlying screening procedures is that the lawyer's involvement in the case *was* significant. If he had not acquired any confidential information, there would be no need for screening at all. Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 723 (7th Cir. 1982) (without considering issue of screening, reversing district court's decision to disqualify law firm and remanding for evidentiary hearing on question whether lawyer had "knowledge of the confidences and secrets of the [former] client").

The next question is whether the Wisconsin Supreme Court rules have any role in resolving motions to disqualify filed in federal court. There is surprisingly little discussion of that question in this circuit. Plaintiff points out that this court has cited the Wisconsin Supreme Court rules in the past in resolving other motions for disqualification. E.g., E2Interactive, Inc. v. Blackhawk Network, Inc., 2010 WL 1981640, *3-4 (W.D. Wis. May 17, 2010); Tucker, 569 F. Supp. 2d at 837. See also National Union Fire Ins. Co. of Pittsburgh, Pa. v. Alticor, Inc., 472 F.3d 436, 437-39 (6th Cir. 2007) (assuming that state rule applied). In addition, plaintiff says that Cromley and Schiessle are consistent with a policy of deference to state law because the rule in those cases is the same as the rule in Illinois, the state where Cromley and Schiessle arose. However, neither side cites any cases in which the court of appeals or a district court discussed the extent to which state rules

18

should be considered in a motion for disqualification.  (The parties acknowledge implicitly that, to the extent federal law controls, it is the Court of Appeals for the Seventh Circuit that provides the relevant authority rather than the Court of Appeals for the Federal Circuit.  i4i Ltd. Partnership v. Microsoft Corp., 589 F.3d 1246, 1256-57 (Fed. Cir. 2009) ("For issues not unique to patent law, we apply the law of the regional circuit in which this appeal would otherwise lie.").)

Despite the lack of a clear holding in this circuit, I agree with defendants that federal law is controlling.  As a general matter, federal courts apply state law to "substantive" questions when state law created the underlying cause of action.  Bevolo v. Carter, 447 F.3d 979, 982 (7th Cir. 2006).  In addition, federal courts may "borrow" state law principles when federal law is silent on a particular question.  E.g., Owens v. Okure, 488 U.S. 235, 239 (1989) (federal courts may refer to statute of limitations under state law when federal law does not provide one).  However, the Supreme Court has held that "[t]he state code of professional responsibility does not by its own terms apply to sanctions in the federal courts."  In re Snyder, 472 U.S. 634, 645 (1985). This is because a federal court's authority to regulate lawyer conduct in its own cases comes from its inherent power, not from a particular state rule.  Id.   See also In re Finkelstein, 901 F.2d 1560, 1564 (11th Cir. 1990) ("It is axiomatic that federal courts admit and suspend attorneys as an exercise of their inherent power.").  If decisions whether to sanction a lawyer for misconduct are decided

under federal law, it follows that "[m]otions to disqualify are . . . decided under federal law" as well. FDIC v. United States Fire Insurance Co., 50 F.3d 1304, 1311-12 (5th Cir. 1995). See also United States v. Miller, 624 F.2d 1198, 1200-01 (3d Cir. 1980)("Supervision of the professional conduct of attorneys practicing in a federal court is a matter of federal law."); 30 Moore's Federal Practice § 808.06[2][b], at 808-80 (3d. ed. 2010) ("Screening is a good example in which courts tend to refer to the emerging body of federal law rather than to the state law."). If that were not the case, district courts could not grant motions filed by lawyers who are not admitted to the state bar to practice in federal court.

Plaintiff cites In re County of Los Angeles, 223 F.3d 990, 995 (9th Cir. 2000), in which the court stated, "we apply state law in determining matters of disqualification," but this decision seems to be an outlier. The court's only support for the proposition was Paul E. Iacono Structural Engineer, Inc. v. Humphrey, 722 F.2d 435, 439 (9th Cir. 1983), in which the court upheld a local rule of a district court that required lawyers to comply with the state rules of professional conduct on the ground that "district courts are free to regulate the conduct of lawyers appearing before them." Thus, Humphrey simply stands for the principle that district courts have discretion to develop their own standards for the conduct of lawyers appearing before them and that it is not an abuse of discretion to include state rules as part of these standards. 30 Moore's Federal Practice § 802.01, at 802-6 (3d ed. 2010) (noting that "[m]ost district courts regulate attorney conduct by local rules"). Any

20

other interpretation would be contrary to <u>Cord v. Smith</u>, 338 F.2d 516, 524 (9th Cir. 1964), in which the court rejected the view that state rules of professional conduct bind federal courts.

     <u>Humphrey</u> is consistent with the view of other courts that have acknowledged that the federal standard may be informed by multiple sources, including state ethical rules.  <u>E.g.</u>, <u>Snyder</u>, 472 U.S. at 645 ("The Court of Appeals was entitled, however, to charge petitioner with the knowledge of and the duty to conform to the state code of professional responsibility.");  <u>FDIC</u>, 50 F.3d at 1311-12 (stating that "[a]t least four separate ethical canons are relevant to a review of the district court's order to disqualify counsel," including state rules); <u>Evans v. Artek Systems Corp.</u>, 715 F.2d 788, 791 (2d Cir. 1983) ("[O]ur decisions on disqualification motions often benefit from guidance offered by the American Bar Association (ABA) and state disciplinary rules."); <u>Miller</u>, 624 F.2d at 1200-01 (concluding that district court did not abuse discretion by adopting state rules of professional conduct).  However, the Court of Appeals for the Seventh Circuit does not seem to have taken this approach in the context of motions for disqualification.  Although plaintiff says that the court of appeals was simply applying the Illinois rules in cases such as <u>Cromley</u>, the court did not actually mention state law in that decision.  In fact, plaintiff does not cite *any* cases involving a motion for disqualification in which the court of appeals relied on or even discussed a state's rules of conduct.  Rather, the court has emphasized that the standard for

disqualification "has been developed through the prior caselaw of the Seventh Circuit." Freeman, 689 F.2d at 722. This may be a recognition that considering multiple sources of law could lead to conflict and confusion. 30 Moore's Federal Practice § 802.02, at 802–9 (3d ed. 2010) (stating that there are "inherent problems" with federal court's reliance on state rules because of lack of clarity regarding result when state rules conflict with other sources).

The natural inference to be drawn from the court's silence regarding state rules of professional conduct is that the federal standard does not incorporate state rules and that district courts should not use those rules as supplemental authority, at least when there is a conflict between the two. Although district courts in Wisconsin, including this one, have cited the state rules in deciding motions for disqualification, this means little because the standards are the same in many respects. Tucker, 569 F. Supp. 2d at 837 ("[T]he standards applicable to disqualification motions brought under either set of rules are 'essentially identical.'") (quoting Callas v. Pappas, 907 F. Supp. 1257, 1260 (E.D. Wis.1995)). Courts in other jurisdictions have made the same observation about state and federal standards. In re American Airlines, Inc., 972 F.2d 605, 610 (5th Cir. 1992). In this case, there is a clear difference between SCR 20:1.10(a) and the federal standard. Plaintiff does not point to any cases in which a district court in the Seventh Circuit used a state rule to impose a requirement above and beyond those in the federal standard. E.g., Chapman v. Chrysler

22

Corp., 54 F. Supp. 2d 864, 865 (S.D. Ind. 1999) (Tinder, J.) (rejecting more restrictive disqualification rule under Indiana law in favor of standard in Cromley).

Plaintiff calls Cromley "dated," suggesting that it may no longer be controlling law. Plt.'s Br., dkt. #672, at 13.  It is true that Cromley is more than 15 years old, but that does not affect its precedential authority.  Plaintiff cites no cases from more recent years in which the court of appeals overruled Cromley, criticized it, limited its holding or otherwise suggested that the court was moving in a different direction.  In fact, neither side cites any Seventh Circuit cases that postdate Cromley, so it may be that the court simply has not issued any published decisions regarding imputed disqualification since that time.

Even if there were authority suggesting that the court of appeals looked to state ethical rules for guidance as a general matter, I do not believe the court would do so in this case for two reasons.  First, although the court has not relied on state rules in previous decisions, it has suggested that previous versions of the ABA model rules influenced its decisions.  E.g., Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc., 607 F.2d 186, 189 (7th Cir. 1979) (stating that Seventh Circuit's standard "embodies the substance of Canons 4 and 9 of the A.B.A. Code of Professional Responsibility").  The ABA's adoption of a rule that is similar to the standard in Cromley  makes it more unlikely that the court of appeals would modify its standard to incorporate SCR 20:1.10(a).

A second reason for exercising caution before following the Wisconsin rules is their

23

internal inconsistency.  The prohibition on screening for lawyers who performed more than "minor and isolated" work for a former client is limited to lawyers moving from one private firm to another private firm.  Under SCR 20:1.11, if a government lawyer "switches sides" and joins a private firm representing a client with interests adverse to the former employer, the firm is not disqualified if the lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.  SCR 20:1.11(b)(1), (c). Thus, in Tucker, 569 F. Supp. 2d at 839-40, which involved a motion to disqualify a law firm employing a former government lawyer, the only question was whether the firm's screening procedures had been adequate.  No one argued that the court should determine whether the lawyers' work for the government was more than minor and isolated.

Before Model Rule 1.10 was amended, this same inconsistency existed in the ABA rules, generating criticism from courts.  E.g., Manning, 849 F.2d at 226 ("[W]e see no reason why the considerations which led the American Bar Association to approve appropriate screening for former government attorneys, should not apply in the case of private attorneys who change their association.").  In fact, the disparate treatment of government and private lawyers was one of the reasons the ABA cited for changing the rules,  Committee Report at 13, and one of the reasons the California Court of Appeals decided to modify its own rule on imputed disqualification.  Kirk, 183 Cal. App. 4th at 805-06 ("Yet if ethical screening can, in any given case, be considered effective to screen a former government attorney in a

24

private law firm, it gives rise to the question why screening cannot be equally effective to screen a private attorney in the same private law firm.")  The commentary to the Wisconsin rules do not provide a rationale for the different standards and none is apparent, unless one assumes that private lawyers as a group are less trustworthy than former government lawyers.  Creamer, supra, at 22 ("There is no principled reason for allowing screening only for former government lawyers . . . . If former government lawyers can be trusted to comply with a screening mechanism, then private lawyers can be trusted to do so as well.")

My conclusion that Cromley is controlling renders irrelevant many of the cases cited by plaintiff.  In Sunbeam Products, Inc. v. Hamilton Beach Brands, Inc., 2010 WL 2928285, *3 (E.D. Va. 2010) and Hitachi, Ltd. v. Tatung Co., 419 F. Supp. 2d 1158 (N.D. Cal. 2006), the courts applied rules that did not permit screening as a potential solution.  In fact, the California rule applied by the court in Hitachi no longer applies even in that state.  Kirk, 183 Cal. App. 4th at 802 ("[W]hen a tainted attorney moves from one private law firm to another, the law gives rise to a rebuttable presumption of imputed knowledge to the law firm, which may be rebutted by evidence of effective ethical screening.")

B.  Application of the Federal Standard

There is no serious dispute that defendants have rebutted the presumption of shared

confidences under the Seventh Circuit standard.  In <u>LaSalle National Bank</u>, 703 F.2d at 258-59, the court of appeals identified various factors that a court may consider in assessing the adequacy of a firm's screening procedures: (1) whether the disqualified lawyer is denied access to relevant files; (2) whether the lawyer is excluded from profits or fees derived from the representation in question; (3) whether discussion of the suit is prohibited in the lawyer's presence; (4) whether members of the firm are prohibited from showing the lawyer any documents relating to the case; (5) whether the disqualified lawyer and others in his firm have affirmed under oath that they have not discussed the case with each other and will not do so in the future; (6) whether the screening arrangement was set up at the time the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem.

Plaintiff does not deny that defendants' screening procedures comply with each of these factors.  Three weeks before Leichtman joined Robins Kaplan, the firm sent a memorandum to Leichtman and all the members of the litigation team for this case.   The memorandum instructed team members not to discuss the case with Leichtman or in his presence.  Under the memorandum, Leichtman is denied access to any records relating to this case and is prohibited from providing team members any information he knows about the case. All of the electronic records are protected by a computer security protocol that prevents Leichtman from viewing or searching those records.   Leichtman and each of the

26

lawyers for Robins Kaplan working on this case have filed declarations in which they aver that Leichtman and the others have not spoken with each other about the case, that none of the lawyers has had a discussion about the case in Leichtman's presence and that Leichtman has not viewed any of the records relevant to this case or attempted to do so. An analysis conducted by Robins Kaplan's computer support group shows that Leichtman has not attempted to view the electronic files. Leichtman will not receive any fees related to this case.

Plaintiff has one objection that focuses on two other factors: "the size and structural divisions of the law firm involved" and "the likelihood of contact between the 'infected' attorney and the specific attorneys responsible for the present representation." Schiessle, 717 F.2d at 421. In particular, plaintiff says that "the risk that Leichtman will inadvertently disclose sensitive information about [plaintiff] (and this case) remains unacceptably high" because Leichtman is part of the same practice group as the Robins Kaplan lawyers working on this case. Plt.'s Br., dkt. #672, at 17.

This argument is not persuasive for two reasons. First, this is not a situation in which Leichtman is likely to have regular contact with any of the lawyers on this case. Robins Kaplan employs approximately 100 intellectual property lawyers. Leichtman works in New York while the lawyers working on this case work in Minneapolis, which is also the location of all the physical files. In the case plaintiff cites, Cheng v. GAF Corp., 631 F.2d 1052, 1058

27

(2d Cir. 1980), the disqualified lawyer worked at a much smaller firm (35 lawyers) and in the same office as the lawyers assigned to the case at issue.  The Court of Appeals for the Second Circuit has since emphasized that <u>Cheng</u> should not be read as a "broad categorical rejection of the efficacy of isolation as protection against taint."  <u>Hempstead Video</u>, 409 F.3d at 138.  <u>See also</u> <u>Reilly v. Computer Associates Long-Term Disability Plan</u>, 423 F. Supp. 2d 5, 9 (E.D.N.Y. 2006) (distinguishing <u>Cheng</u> on ground that "most or all the attorneys were located in the same physical office as the disqualified attorney"). Plaintiff does not cite any cases in which a court concluded that the risk of inappropriate contact was too great when the lawyers at issue worked in different parts of the country.  <u>Kirk</u>, 183 Cal. App. 4th at 809 ("[I]n certain cases, the public trust in the scrupulous administration of justice is not advanced (and, in fact, may be undermined) by an order disqualifying a party's long-term counsel due to the presence of another attorney in a different office of the same firm, who possesses only a small amount of potentially relevant confidential information, and has been effectively screened."); <u>Battagliola v. National Life Insurance Co.</u>, 2005 WL 101353, *16 (S.D.N.Y. 2005) (concluding that disqualified lawyer "can easily be screened since he works from a different office than the attorneys in the firm handling the case" at issue).

Second, to the extent simple geography does not adequately protect plaintiff, defendants have promised to take two additional steps:   "(1) Leichtman will not work on any case with any of the <u>SGI v. ATI</u> attorneys; and (2) Leichtman will not attend any

28

meetings on any subject with any lawyer who has worked on this case, including department meetings or quarterly partners meetings." Dfts.' Br., dkt. #679, at 5-6. Defendants make this representation in a brief, but they agree to submit declarations upon request. Id. at 5 n.5. Under these circumstances, I conclude that defendants' screening procedures are adequate to prevent any inadvertent disclosure of confidential information.

In its opening brief, plaintiff includes one paragraph in which it argues that Leichtman did not provide adequate notice of the screening procedures. In particular, plaintiff says that Leichtman's notice was defective because "it failed to explain the precise steps undertaken to satisfy SCR 20:1.10(a)(2)" and "makes no provisions regarding 'profits' from the SGI dispute." Plt.'s Br., dkt. #634, at 13. (Plaintiff also says that the notice "provides a clearly inaccurate portrayal of [Leichtman's] work on behalf of SGI" by characterizing it as minor, but that is a substantive legal disagreement that has nothing with the adequacy of the notice.)

Because I am following the precedent of the Court of Appeals for the Seventh Circuit, any notice requirements in SCR 20.1:10 are not binding. Plaintiff does not cite any authority from this circuit that imposes a particular notice requirement on the lawyer changing firms. However, even if I assumed that the federal standard included an implicit requirement of fair notice, I would have no difficulty concluding that Leichtman met this requirement. In his December 18, 2009 letter, Leichtman explained the screening

29

procedures Robins Kaplan would employ.  In the December 29 letter, Leichtman repeated the promise of screening and informed plaintiff that he "will be apportioned no part of the fee from the matter."  Plaintiff does not identify any additional information it needed.  In any event, plaintiff seems to acknowledge that Leichtman provided sufficient notice because it drops the issue in its reply brief.  <u>Cincinnati Insurance Co. v. Eastern Atlantic Insurance Co.</u>, 260 F.3d 742, 747 (7th Cir. 2001) (failure to respond to argument operates as waiver).

## C.  <u>Application of the State Standard</u>

Even if I assume that SCR 20:1.10(a) is relevant as persuasive authority, this does not mean that plaintiff would prevail.  The current version of SCR 1.10(a) is relatively new and there does not yet seem to be any case law interpreting the phrase "minor and isolated." Defendants cite statements from members of the Wisconsin State Bar Professional Ethics Committee suggesting that "an associate who may have done some document review" would qualify for screening, Dean R. Dietrich and Timothy J. Pierce, "Overview: Court's Proposed Changes to Attorney Conduct Rules," <u>Wisconsin Lawyer</u> (July 2006), but a "lawyer who has primary responsibility for litigation in the old law firm" would not. Dean R. Dietrich, "Screen Transferring Lawyers for Conflicts," <u>Wisconsin Lawyer</u> (August 2006).  However, these are examples at the extremes that have little resemblance to this case. Further, the parties do not identify any other states that use the same language as the Wisconsin rule.  (Defendants say

30

that "it appears no other state had adopted this wording in its professional responsibility rules." Dfts.' Br., dkt. #646, at 28.)  Thus, there seems to be little guidance for applying the rule.

If one interprets the terms "minor" and "isolated" as requiring a simple adding exercise, defendants would have a difficult time satisfying the standard.  Leichtman billed plaintiff for 186 hours on this case, which could be viewed as a significant amount of time in many contexts.  However, defendants point out that Leichtman's time stretches out over a 10-month period so that he spent an average of approximately 5 hours a week on the case. In addition, they estimate that his time is likely only about 1 percent of the total time claimed by plaintiff's lawyers in this case.

The parties' arguments about the quantity of work Leichtman did for plaintiff may miss the point.  It must be remembered that the purpose of imputed disqualification is to prevent shared confidences from being used against a former client.  Thus, an analysis that looks only to the number of hours worked, without an inquiry into the *type* of work performed, is likely to require disqualification in many cases without serving the purpose behind the rule.

The Restatement of the Law Governing Lawyers on imputed disqualification recognizes that "quality" is more important than "quantity."  Like SCR 20:1.10(a), disqualification may be required under § 124 of the Restatement regardless of the adequacy

31

of screening procedures. However, under § 124(2)(a) the question is whether "any confidential client information communicated to the personally prohibited lawyer is unlikely to be significant in the subsequent matter." Restatement (Third), The Law Governing Lawyers §124, at 297-98 (2000). This makes sense because it is tied directly to the purpose of the rule. Even if the lawyer worked many hours for the former client, there would be no legitimate reason to disqualify the new law firm if the lawyer had not learned any confidential information or if the information he learned has no bearing on the issues remaining in the case.

If SCR 20:1.10(a) is interpreted as imposing a standard similar to § 124, defendants have a stronger argument that Leichtman's work was "minor" and "isolated." Leichtman avers that he had little if any contact with the client, was not involved in any pre-suit investigation and had a role that was limited to "assist[ing] [his] partners in several discrete areas." Leichtman Decl. ¶¶ 25-26, dkt. #656. Specifically, he says that he helped witha a "dispute surrounding the discovery of certain documents requested from Nintendo" and with a brief and a deposition related to inequitable conduct. Id. at 27-30. In addition, he says that he was "involved in a limited way in the damages aspect of the litigation," which included screening potential damages experts. However, he denies being involved in preparing the expert reports, discussing substantive issues on damages or reviewing confidential documents related to damages. Id. at ¶¶ 31-32.

32

Plaintiff agrees that these are the areas of the case on which Leichtman worked. Bollinger Aff. ¶3, dkt. #635. Plaintiff takes a different view of the *nature* of Leichtman's work, but it does a poor job of supporting the arguments in its opening brief with evidence in the record. For example, plaintiff says that Leichtman "assisted in strategic planning and decision-making." Dkt. #634, at 3. However, its only citation for this proposition is a three-sentence email:

> Got your letter. Let's do the meet and confer tomorrow morning, you can call me at [phone number omitted]. I read the transcript on what the Judge meant so I'm not sure we can find any common ground, but I'm not adverse to trying.

Bollinger Aff., dkt. #635, exh. B. Defendants provide no context for this email, but it seems to be related to a discovery ruling of the magistrate judge. In another example, plaintiff says that Leichtman "frequently managed associates and attended team meetings and conferences." Dkt. #634, at 3. For this proposition, plaintiff cites an email in which Leichtman directed another employee to change one line in a letter she drafted about an expert's failure to provide a list of cases in which she testified. Bollinger Aff., dkt. #635, exh. C.

Even worse, some of plaintiff's representations in its brief are completely unsupported by the cited reference. For example, plaintiff says that Leichtman "received detailed privileged information regarding many aspects of the dispute, including critical strategic

33

information and related work product." Dkt. #634 at 3.   This is a broad and vague statement, but the declaration cited in support is even less helpful.   Another lawyer from Leichtman's former law firm avers that Leichtman "attended meetings where pre-trial strategy was discussed, including the selection of a damages expert and how to address Nintendo discovery." Bollinger Aff. ¶3, dkt. #635.  This declaration does not identify even generally why it is reasonable to believe that Leichtman acquired "detailed privileged information" or "critical strategic information and related work product."  Also, plaintiff says that Leichtman was "responsible for [plaintff's] damages case." Dkt. #634, at 3.   Plaintiff cites three exhibits for this proposition.   One is simply a list of employees for Invotex, one is a docket sheet for another case and one is an email discussing Leichtman's availability (for what plaintiff does not say).   Bollinger Aff., dkt. #635, exhs. G, H and I.

Even setting aside the discrepancies between plaintiff's brief and its evidence, the parties seem to agree that much of what Leichtman did for plaintiff no longer has any relevance to this case.  Again, the parties have identified three areas of the lawsuit in which Leichtman was involved: (1) third party discovery related to Nintendo; (2) defending against a counterclaim for inequitable conduct; and (3) damages.  I dismissed defendants' claim for inequitable conduct, a decision defendants did not appeal.  With respect to third party discovery, plaintiff did not pursue a claim against Nintendo and it does not identify any purpose that the documents obtained from that company might serve with respect to the

34

remaining claims.

This leaves the issue of damages.  Defendants cannot deny that damages are still an important issue.  However, Leichtman represents that he was involved at the preliminary stages only and did not acquire any confidential information related to damages.  Looking at the materials cited in plaintiff's opening brief, it is difficult to disagree with defendants' characterization.  Plaintiff includes more materials with its reply brief, but that was too late. E2Interactive, 2010 WL 1981640, at *1("A reply brief is . . . not a chance to introduce new lines of arguments or facts that a movant failed to introduce earlier. A moving party is expected to come with its game when it files its motion, addressing completely each issue that must be addressed to obtain the relief it seeks.") Even in the reply brief, plaintiff continues to make conclusory assertions without explaining why it believes that Leichtman is likely to possess any confidential information that remains relevant to the case.

Finally, I note that a violation of a state rule does not necessarily require disqualification, even in those jurisdictions that rely on those rules.  "[D]isqualification is never automatic."  Miller, 624 F.2d at 1201.  Rather, it "is a drastic measure which courts should hesitate to impose except when absolutely necessary." Freeman, 689 F.2d at 721. Courts must "consider the ends that the disciplinary rule is designed to serve and any countervailing policies."  Miller, 624 F.2d at 1201.  In this case, even if Leichtman's work for plaintiff was not "minor and isolated" under SCR 20:1.10, it would not be appropriate

35

to disqualify Robins Kaplan because defendants have shown that there is no appreciable risk that Leichtman will share any confidential information with the firm.


ORDER

IT IS ORDERED that

1.  Plaintiff Silicon Graphics, Inc.'s motion to disqualify the law firm Robins, Kaplan, Miller & Ciresi from representing defendants ATI Technologies, Inc., ATI Technologies ULC and Advanced Micro Devices, Inc. in this case, dkt. #633, is DENIED.

2.  The motion for oral argument filed by defendants, dkt. #670, is DENIED.

3.  Defendants' motion for leave to file a surreply brief, dkt. #678, is GRANTED.

4.  Defendants may have until October 12, 2010 to submit declarations establishing that (a) David Leichtman will not work on any case with any of the lawyers representing defendants in this case; and (b) Leichtman will not attend any meetings on any subject with any lawyer who has worked on this case, including department meetings or quarterly partners' meetings.

5.  The clerk of court is directed to set a conference before the magistrate judge to

determine a schedule for the remainder of the case.

Entered this 5th day of October, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge